## American Conduit Manufacturing Company, Appellant, *v.* Kensington Water Company.

*Equity—Water companies—Customer's right to service—Cross-bills—Misappropriation of water—Decree.*

On a bill in equity filed by a customer against a water company to enjoin the shutting off of water, where the defendant company files a cross-bill for an accounting for water alleged to have been stolen by the plaintiff from the defendant company by means of a meter device, and the chancellor finds the wrongdoing as a fact, and further finds from the evidence introduced by the defendant that it was not unreasonable to believe that an average of 9,000 gallons a day for twenty-six days each month during a certain period had been misappropriated by means of the device, a decree holding that the plaintiff should pay the defendant for this amount of water during the period in question at the market value of water during that time, and enjoining the defendant company from shutting off the water supply of plaintiff providing the plaintiff should comply with the rules of the water company and pay the amount found to be due will be sustained on appeal.

Argued Oct. 23, 1911.  Appeal, No. 161, Oct. T., 1911, by plaintiff from decree of C. P. No. 2 Allegheny Co., Jan. T., 1911, No. 456, on bill and cross bill in equity in case of The American Conduit Manufacturing Company v. Kensington Water Company.  Before FELL, C. J., MESTREZAT, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ.  Affirmed.

Bill in equity for an injunction.  Cross-bill to recover for water misappropriated.

SHAFER, J., filed the following opinion:

The bill is by a customer of a water company to enjoin the shutting off of the water by it.  The defendant company filed a cross-bill for an accounting for water alleged to be stolen by the plaintiff from the defendant company by means of a device connecting the main with the company's works without passing through the meter.

First. The plaintiff is a manufacturing company, having its works located in the Borough of Kensington, Westmoreland County, and the defendant is a water company incorporated for the purpose of furnishing water to the Borough of Kensington under the laws of Pennsylvania relating to water companies.

Second. In September, 1903, and for sometime prior thereto, the water company furnished water to the plaintiff at a certain rate per month, without measurement. Sometime before October 1, 1903, the plaintiff was notified by the water company that they desired to install a meter, and that the flat rate theretofore prevailing would cease on October 1, 1903.

Third. From that time until the following May there appear to have been negotiations of some character between the plaintiff and defendant as to the method of furnishing water and no meter was in fact put in until May 16, 1904, and it was agreed by the parties sometime before that, that after the meter was put in a test should be made for a certain length of time and the water furnished after October 1, 1903, and up to May 16, 1904, should be paid for by a rate to be established by the average readings of the meter for a certain time.

Fourth. The meter was put in by the plaintiff company and either by the addition of new pipes or the adaptation of those which were already in use, or both, the arrangement of the pipes conducting the water from the water main into the works of the plaintiff, at and immediately after the installation of the meter was as follows: the street on which the water main lies runs north and south. From this main to the south side of the plaintiff's works a pipe was run at right angles to it for some distance into the ground of the plaintiff. From this pipe there extended north, and parallel with the street, three pipes; the first of which, counting from the street, passed through the meter; the second extends some distance into the yard and ends in a hydrant; and the third extends northward to a part of the plaintiff's

works including a gas engine. From the third pipe to the first, after the first passed through the meter, extended another pipe, in a southerly direction, connecting the first and third pipes. The stop-cocks on these pipes were, one near the street, which would shut off all the water; one on the third pipe and going to the branch pipe leading south to the first pipe; another one on the third pipe after that branch; one on the branch itself; and one on the second pipe. The last four mentioned valves being within a foot or so of each other and enclosed in a box, which could be reached with a proper instrument from the surface of the ground, so as to turn them on or off.

Fifth. The object of this device was to enable the plaintiff to take the water without its passing through the meter, and the effect of the construction was that none of the water which passed through the second pipe could pass through the meter; that all the water which passed through the third pipe might be allowed to pass through the meter or none of it pass through, as might be desired, and that all the water which passed through the first pipe might be made to pass through the meter or part of it might be allowed to pass through the meter and a part to pass through the branch pipe, as desired.

Sixth. According to the readings of the meter from May 16, 1904, to June 30, 1904, a settlement was made for the water used between October 1, 1903, and May 16, 1904, the parties having agreed to settle for this water, not actually measured, according to the readings of the meter for a month and a half after May 16th.

Seventh. The water company continued to furnish water and render monthly bills therefor, according to the readings of the meter, on its schedule of rates, until about October 22, 1910; the same being paid by the plaintiff company.

Eighth. The present officers of the plaintiff company were none of them connected with the company at the time the device above mentioned was installed. The

president of the company at that time, by whose direction the device was put in, being dead. The fact of its existence was known to some of the employes.

Ninth. The bill in this case alleges that the first knowledge any of the officers of the company had of the existence of the by-pass "which caused it to make an investigation," was on or about May 1, 1910. The present president of the plaintiff company who has held that office since January, 1910, and immediately before that time was secretary and treasurer of it, testified that Armstrong, who was then a foreman for that company, said to him as he saw a check made out for the water company, that the water company had done him a wrong and he had gotten even with them, saying, "I fixed it down at the fixture so we are getting a lot of water we are not paying for." This is denied by Armstrong, who says he never told the president of the company anything about it until May, 1910. The fact is, however, that no steps were taken to investigate any supposed method of stealing water until May, 1910, when Armstrong, who had in the meantime gone out of the service of the plaintiff company, and had had some contention with them, informed the president of the company of the nature of the by-pass, giving him a sketch of it.

Tenth. At that time, or sometime later in the summer, the president of the plaintiff company directed one of the valves to be turned so that the water could not pass through the gas engine, and ordered it to be cut off so that it could not be re-turned, and one of the valves was so cut off.

Eleventh. The officers of the plaintiff company did not communicate to the water company the existence of the by-pass and it became known to them only by information from Armstrong, given in October, 1910. On October 22, 1910, the water company made an examination of the plant, taking off the meter and substituting for it a piece of pipe with a stop-cock in it, and making tests at different parts of the plant, from which it was

ascertained that in addition to the water at the hydrant, which could not pass through the meter, water was running to the gas engine, although the stop-cock in the pipe substituted for the meter was closed. The valves were then closed so that, so far as appears, no water went through the by-pass since that time except what may have gone by way of the hydrant.

Twelfth. It is obviously impossible to determine with accuracy, or any approximation to it, the amount of water which went through the by-pass and was therefore not measured by the meter during the time from May 16, 1904, to October 22, 1910, and we have no evidence of the amount which could have so passed. The best that can be done under the circumstances, in view of the rule that everything is to be presumed against the party by whose fault the want of more accurate measurement arose, is to take the various uses of the different parts of the plaintiff's works and the amount of water probably used by them and in that way ascertain the amount of water which may well have passed through the by-pass and been used by the plaintiff.

Thirteenth. The defendant has given evidence as to the amount of water probably used in the gas engine and at the hydrant, and also of the amount probably wasted by a leak alleged to be in the gas engine, together with the number of hours and days when these sources of loss to the defendant were probably in operation, and the plaintiff has given evidence tending to show that the estimate of the defendant is too large. No attempt was made on the part of the defendant to show anything about the water which may have passed into the other parts of the works through the connection which, when open, competed with the connection through the meter. The evidence on the part of the defendant shows that it is not unreasonable to believe that an average of 9,393 gallons was lost to the defendant daily for twenty-six days of each month during the period in question, amounting in a month to 244,218

gallons, the total amount so taken being obtained by multiplying this amount by the number of months from May 16, 1904, to October 22, 1910.

Fourteenth. As to the amount of water supplied by the defendant to the plaintiff from October 1, 1903, to May 16, 1904, it appears that the gas engine and hydrant were in use during that time substantially as they were afterwards; that no meter was then in use, although the flat rate had been discontinued, and that the water so supplied was paid for by the plaintiff company upon the average of the meter readings for a certain time after May 16, 1904. The defendant company was therefore deceived in its settlement for the water furnished during these months. No water was, however, stolen during these months.

Fifteenth. The market value of water during all the time in question was 30 cents per thousand gallons. The meter rates charged by the defendant company were, for 500 gallons or less daily, 30 cents per thousand; from 1,000 to 5,000 gallons daily, 25 cents per thousand; from 5,000 to 15,000 gallons daily, 15 cents per thousand. The rate, however, at which water was actually furnished to the plaintiff by meter was by special contract, under a schedule known as the "Manufacturers' Schedule of Meter Rates," in which the price of 500 gallons per day is 30 cents per thousand; 5,000 gallons per day, 12.31 cents per thousand; 9,000 daily is 10.94 cents per thousand, and of 10,000 gallons per day is 10.75 cents per thousand. The whole of the last mentioned schedule being set out in the seventh paragraph of the answer.

Sixteenth. Sometime before the filing of the bill, the defendant company made a claim upon the plaintiff company for a sum of money, amounting to something less than $6,000, for the water alleged to be stolen, and demanded payment of it, and threatened if the same were not paid, to shut off the water altogether. The plaintiff refused to make the payment demanded, and thereupon filed this bill.

CONCLUSIONS OF LAW.

First.  Upon a state of facts such as appears in this case it seems to us that there is a single principle of law upon which the rights and duties of the parties is to be determined, and that is the principle embodied in the maxim, "Omniapraesumunter contra spoliatorem." We deem it unnecessary to cite cases to show the applicability of this maxim to the case in hand.

Second.  A strict application of this maxim might justify a finding against the plaintiff for all the water which the device installed by it could have taken from the defendant.  The defendant company had not undertaken to show how much this might be, but has taken a view of the matter more favorable to the plaintiff and shown the amount which, considering the construction of the pipes and apparatus through which water was taken, and the uses to which it was put in the operation of the plaintiff's works, may reasonably be supposed to have been taken by the plaintiff.  As it is evidently impossible to ascertain with any approach of accuracy the amount of water actually taken, and as this impossibility was created solely by the wrong of the plaintiff, we think the plaintiff is chargeable at least with the amount which it may have probably taken, to say nothing of what it may possibly have taken.

Third.  As to the water supplied from October 1, 1903, to May, 1904, we do not see how under the pleadings the defendant is entitled to recover anything in this proceeding.  The bill alleges the stealing of water to have taken place from October, 1903, down to the present time, whereas, in fact, the actual taking of water by means of a by-pass began in 1904, and the wrong done to the defendant was the procuring of a settlement with it for the water theretofore supplied upon a false basis. As no relief is prayed for on this ground in the cross-bill, we are of opinion that the defendant is not entitled to recover anything in this proceeding for any loss of water which occurred before May 16, 1904.

Fourth. As to the price which the plaintiff should pay for the amount of water so determined to have been taken, it is contended by the plaintiff that it is liable only for the price which the defendant would have been entitled to receive for the same if it had passed through the meter, according to the schedule of rates published by the company. The defendant's contention is that it is entitled to recover the market price of the water taken by the gallon, without reference to the rates at which water was furnished to customers by meter. The only evidence on the market value of water during the time in question was that it was 30 cents per thousand gallons, which is much greater than the schedule of rates published by the company. We do not well understand how the plaintiff company can claim any rebate from the ordinary or market price of water because it stole a large quantity, and are therefore of opinion that the measure of defendant's damage is the market value of water, namely, 30 cents per thousand gallons.

The defendant is obviously entitled to interest or its equivalent upon the value of the water so taken, the delay in payment being caused entirely by plaintiff, and as the payments for water delivered should have been made monthly, the interest ought to be calculated upon the amount found to be taken each month.

Fifth. The relief prayed for by the plaintiff is an injunction to prevent the defendant from shutting off the supply of water now furnished by it by meter, which the defendant had threatened to do unless it were paid the sum demanded by it for the water taken as above described. As the defendant company is a public service corporation it seems to us to be bound to furnish water to the plaintiff, notwithstanding the matters above set forth. To hold otherwise would be to make it the judge in its own cause and to enable it to impose upon the plaintiff a penalty for its wrongdoing different from that which is provided by law.

We are therefore of opinion that the plaintiff is en-

titled to an injunction restraining the defendant company from ceasing to supply water to the plaintiff by meter so long as the plaintiff company shall comply with the reasonable rules of the defendant company in regard to the supply of water.

Sixth. No question of the jurisdiction of the court to entertain either the bill or the cross-bill was raised by either party.

Seventh. Let a decree be entered that the defendant be enjoined from cutting off the supply of water to the plaintiff so long as the plaintiff shall comply with the rules of the water company and pay according to its rules for the water supplied according to the meter readings, provided that the plaintiff company shall pay to the defendant company, within thirty days hereafter, all arrearages for water supplied since the filing of the bill; and, further, that the plaintiff company pay to the defendant company for the water taken by it at the rate of 30 cents per thousand gallons, with interest to be calculated from the end of each month, upon the amount due for that month; the amount of each month to be ascertained by taking 9,393 gallons of water taken each day for 26 days in each month, the calculation to begin with May 16, 1904, to October 22, 1910, and that the plaintiff pay the costs.

And now, to wit, June 24, 1911, this cause came on to be heard at this term, and was argued by counsel, and upon consideration thereof, it is ordered, adjudged and decreed as follows, viz:—that the defendant, Kensington Water Company, is enjoined from cutting off the supply of water to the American Conduit Manufacturing Company, the plaintiff, so long as the plaintiff shall comply with the rules of the Water Company and pay, according to its rules, for the water supplied, according to the meter readings; provided, that the American Conduit Manufacturing Company, the plaintiff, shall pay to the Kensington Water Company, the defendant, within

thirty days hereafter, all arrearages for water supplied since the filing of the bill, and it is further ordered, adjudged and decreed that the American Conduit Manufacturing Company, the plaintiff, has unlawfully taken from Kensington Water Company, the defendant, through the by-pass arrangement complained of in the cross-bill, water to the amount of nine thousand, three hundred and ninety-three (9,393) gallons for each day for twenty-six days in each month, during the period beginning with May 16, 1904, and ending October 22, 1910; further, that the American Conduit Manufacturing Company, the plaintiff, shall pay to Kensington Water Company, the defendant, for the water so taken by it at the rate of thirty (30) cents per thousand gallons, with interest to be calculated from the end of each month upon the amount due for that month, being the sum of six thousand nine hundred sixty-six dollars and fifty cents ($6,966.50); it is also further ordered, adjudged and decreed that the American Conduit Manufacturing Company, the plaintiff, shall forthwith remove the system or arrangement of pipes constituting the by-pass complained of in the cross-bill filed in the above entitled suit, or shall make such changes in the arrangement of the pipes constituting the by-pass, as shall render the operation of the same as a by-pass physically impossible, and that this shall be done under the supervision and subject to the reasonable inspection of the employees of the Kensington Water Company, the defendant, in accordance with the rules of the said Water Company; and it is further ordered, adjudged and decreed that the American Conduit Manufacturing Company, the plaintiff, pay the costs.

Plaintiff appealed.

*Errors assigned* were dismissal of plaintiff's exceptions and the decree of the court.

*Edward Schreiner,* for appellant.

*William Watson Smith,* of *Gordon & Smith,* with him *Alexander Black,* for appellee.

PER CURIAM, January 2, 1912:

The decree is affirmed on the findings of fact and conclusions of law by Judge SHAFER.