## Philadelphia v. Charleston

*Abraham L. Freedman,* City Solicitor, for plaintiff.
*Joseph Singer,* for defendant.

DAVIS, J., April 3, 1956.—This case involves the city's claim for excess water and sewer rent for the period from January 1, 1943, to January 22, 1951,

against the premises once owned by defendant, Joseph Charleston. He is now deceased and the claim is being resisted by his widow as executrix.

On January 1, 1943, the water meter on the premises was not registering; it apparently had been out of order for some time before that date. The city repaired the meter and set the dials to zero on September 17, 1950. The meter was read on January 22, 1951, and the average daily consumption for the period since September 17, 1950, was computed. On February 1, 1951, defendant was sent the following bill based on this daily average for excess water consumed during the period from January 1, 1943, to January 22, 1951:

"The Meter in the above account had not been registering since 1938. Inasmuch as that you have only occupied these premises since 1943, we are billing you back to 1/1/43, as the meter has been repaired and set to zero, 9/17/50.

*"Basis*

"9/17/50 to 1/22/51 or 127 days or 141000 C.F. consumption or 1110 C.F. daily.

*"Billing:*

"1/1/43 to 12/31/48 or 2192 days @ 1110 or 2433100-780000 or 1653100 @ 40¢ or $661.24.

"1/1/49 to 1/22/51 or 752 days @ 1110 or 834700-130000 or 704700 @ 45¢ or $317.12.

"$661.24 plus $317.12 equals $978.36 total water.

*"Sewer:*

"1946, 365 days @ 1110 or 405200-130000 or 275200 @ 42% ..................... $46.23

"1947, 365 days @ 1110 or 405200-130000 or 275200 @ 49% ...................... 53.94

"1948, 365 days @ 1110 or 406300-130000 or 276300 @ 56% ...................... 61.89

"1949, 365 days @ 1110 or 405200-65000 or
    340200 @ 56% ........................ 85.73
"1950, 365 days @ 1110 or 405200-65000 or
    340200 @ 59.5% ...................... 91.09
"1951, 22 days @ 1110 or 24400............ 6.92

        "Total sewer ......................$345.80

"Note: Effective 1/1/49 per Ordinance of Council, water may increase from 40¢ to 45¢ per 1000 C.F. and minimum allowance reduced 50%. Sewer went into effect 1/1/46, per Ordinance of Council."

Defendant does not contend that this method of computing the bill was improper. See American Conduit Mfg. Co. v. Kensington Water Co., 234 Pa. 208 (1912); Philadelphia v. Goetz, 71 D. & C. 500 (1950); but see Estate of William D. Martin, decd., Tax Board Review opinion no. 56-4, docket no. 100.02-42 (March 16, 1956).

The city filed its claim in court on May 21, 1954, and the claim became a lien on the property: Municipal Lien Act of May 16, 1923, P. L. 207, sec. 3, 53 PS §2023. The claim, which was typed on a printed form, was on its face for "Water Rent for the year 1951" and "Sewer Rent for the year 1951", together with interest and a penalty. The case was heard without a jury. In order to clarify the record, and over defendant's objections, we allowed the city to amend its claim to read:

"Excess water rent for the period January 1, 1943, to January 22, 1951.

"Excess sewer rent for the period January 1, 1943, to January 22, 1951."

Defendant argues that the claim is barred by the statute which states that: "Claims for . . . water rents . . . and sewer rates must be filed in the court of common pleas . . . on or before the last day of the

third calendar year after that in which the taxes or rates are first payable . . .": Municipal Lien Act of May 16, 1923, P. L. 207, sec. 9, 53 PS §2029. Both sides have argued this case on the assumption that the above-quoted statute controls and that it is a statute of limitations.[1] See Philadelphia v. Goetz, supra.

Ordinarily, it would seem that the rates become "first payable" either as soon as the meters are read or within a reasonable time after the meters should have been read for each rent year. Since there are many thousands of meters to read, the city cannot read them all on one day. The city should have a reasonable time to read each meter and render a bill in order to start the statute of limitations running against it.

Under the claim before us, it would appear that defendant is entitled to a verdict covering the water used in his property during the period from 1943 to 1949, while the city is entitled to a lien on the prop-

---

[1] It should be noted that the city has no other action against defendant aside from its in rem lien claim filed in this court. The only statute which would seem to authorize an in personam action is the Act of April 17, 1929, P. L. 527, no. 229, sec. 1, 53 PS §§482 and 2071, which provides that cities may proceed for the recovery of "municipal claims" by actions of assumpsit against the persons who were the owners of a property "at the time of the completion of the improvement". Since the statute further provides that such action in assumpsit "shall be commenced within three years after the completion of the improvement from which said claim arises", it would seem that the city is barred by a three-year statute of limitations on an assumpsit action as well as on its lien claim. The Superior Court has said, however, that no assumpsit action whatever will lie against a property owner, because water rents cannot be classed as "municipal improvements" within the meaning of the Act of April 17, 1929, and the authority to file a claim for water rents does not impose personal liability upon the owner of the property: Provident Trust Co. v. Judicial B. & L. Assn., 112 Pa. Superior Ct. 352, 358-9 (1934), and cases cited therein. See, also, Girard Trust Corn Exchange Bank v. Ermilio, 178 Pa. Superior Ct. 316, 319 (1955).

erty for excess water and sewer rent used during the entire year of 1950 and the first 22 days of 1951.

The bill was rendered on February 1, 1951. This was within a reasonable time after the close of the year 1950 and the first 22 days of 1951, but it was in our opinion unreasonable for the city to delay 13 months in sending a bill for the period which ended on December 31, 1949. A bill for 1949 should have been rendered at least by the end of 1950. Hence, the three-year statute of limitations on the claim for the year 1949 and earlier started running against the city at some date in 1950. The lien is lost if the claim is not filed on or before the last day of the third calendar year after that in which the statute begins to run. Since the statute began to run in 1950, the last day of the third calendar year after 1950 is December 31, 1953. Since the claim was filed in court on May 21, 1954, the lien for the water used in 1949 and before was lost.

The statute of limitations for the water used during 1950 and the first 22 days of 1951 started running when the bill was rendered on February 1, 1951. The last day of the third calendar year after 1951 is December 31, 1954. Since the claim was filed before that date, the lien for water consumed in 1950 and 1951 is valid and subsisting.

The city's answer to the defense that part of its claim is barred by the statute of limitations is that the city should be required to render its bills for excess water rent within a reasonable time after the close of a water rent year and, under the circumstances, no unreasonable period of time had elapsed between the time when the water was furnished and the date when the bill was sent.

The first question for us to decide is whether the city's legal premises are correct. The city's argument is that since the statute of limitations starts running

when the bill is "first payable", the statute does not begin to run unless and until the city reads the meters and submits a bill, since the excess water bill cannot be paid or be "payable" until the bill is rendered to the consumer. It argues, in other words, that the rendering of a bill for excess water is a condition precedent to starting the statute running against the city. The city admits that it cannot delay rendering such a bill for an unreasonable period of time, citing Chittenholm v. Giffin, 357 Pa. 616, 620 (1947) : "Where . . . the time for doing an act, necessarily precedent to bringing suit is indefinite, the law allows only a reasonable time."

Defendant contends that the time for the city to file the claim is mandatory and the statute must be strictly construed against the city. Defendant cites Middlesex Township v. Wetzel, 32 D. & C. 525 (C. P. Cumberland County, 1938), which construed the statute in question as applied to a tax lien. This rule should not be applied in the instant case because the facts are different. In the case of a tax lien, there is no difficulty in getting out a tax bill, but an excess water bill cannot be rendered if the meter does not register. When a water meter gets out of order, the city should have a reasonable time in which to repair it and render a bill.

Assuming that the city's statement of the law is correct, the next question to be decided is whether the city's evidence supports its contention that no unreasonable period of time had expired between the period when the water was furnished and the date when the bill was sent.

The main reason why a bill for excess water was not rendered until 1951 was that the meter had been out of order from 1943 until September 17, 1950. The city seems to tacitly admit that the mere fact that the meter was out of order would not prevent the statute from running against it, but gives two reasons to

explain its delay in repairing the meter: First, the city could not get meter parts because of a wartime shortage; second, the city was restrained from purchasing meter parts by litigation in McHugh v. Samuel, infra, from the filing of the complaint in equity on February 9, 1944, to the final order of the court on May 10, 1947.

In support of its contention that the meters could not be repaired from 1943 to 1950, since parts were unobtainable because of a war-induced shortage, the city introduced two witnesses.

Gerald E. Arnold, deputy water commissioner, testified that during the war he was assigned to the War Production Board in connection with utility operations, including water works and metering, and that from 1943 until about 1946 he was regional engineer for the War Production Board in charge of utility operations in the 11 western States. This position brought him in contact with the activities of the War Production Board and with the shortage of materials that was current at that time. Mr. Arnold further testified that the principal metal component of water meters is copper, that copper was in short supply, that when he came to Philadelphia (on September 15, 1952) there was a considerable backlog of meters already in the shop awaiting repairs, and also a very large backlog of meters which were still on the consumers' premises, even though they had been reported inoperative.

Mr. Arnold actually testified, in substance, that the supply of meter components *was short during the period from 1943 until 1946*. He did not testify that meter parts could not be obtained at all during that period nor could not easily be obtained after the war was over. The fact that there was a backlog of unrepaired meters in 1952 is not necessarily evidence that meter parts could not be obtained then, especially since

the war ended on August 14, 1945, and the meter parts should have been available fairly soon afterward. Furthermore, as will be indicated later in the discussion of the McHugh case, the city did not purchase meter parts until 1947 because the city was involved in litigation by its own fault.

The second witness was Edward Staats, foreman of the meter repair shop, who started as a repairman in 1942. He testified, in response to a question as to what the situation was during 1943 to 1950, that "parts were pretty tough to obtain. . . . We could not get the materials to repair [meters] . . . there was some sort of shortage during the war, metal shortage, and the companies I imagine just could not furnish them". He also said that he did not have "too much" knowledge of litigation concerning water meter parts, that sometimes the city could not obtain parts, but it furnished a list of parts to the property owners, together with addresses of where the owners could purchase parts, and the property owners at one time could obtain parts when the city was not able to do so.

Mr. Staats' testimony is not convincing evidence that the city could not obtain parts because of a wartime shortage. Mr. Staats admitted that he knew little about the litigation which the city claims was the other major reason why it could not obtain parts. He apparently did not deal directly with the manufacturers and order the parts himself. In fact, his testimony indicates that at some period the property owners could obtain parts but the city for some reason could not. The reason why the city did not obtain parts when parts were available to private citizens may be found in the circumstances surrounding the McHugh case.

In McHugh v. Samuel, C. P. 6, December term, 1943, no. 2739, Flood, J., plaintiff real party in interest was the Phoenix Meter Corporation, a company, which, while it did not manufacture complete meters,

had been furnishing the greater portion of parts for repairing water meters for a number of years because it was consistently the low bidder. A number of manufacturers of complete meters and parts complained to the water bureau because they were not getting a share of the parts contracts, and one of them wrote a letter to the then chief of the water bureau stating that it could not assume responsibility for the accuracy of its meters unless the bureau used only parts made by it. Apparently as a result of pressure from the meter manufacturers, the city, shortly before December 27, 1943, issued bids for replacement parts for certain meters, on the condition that bids would be accepted only from manufacturers of the meters for which replacement parts were to be furnished. In the ensuing bidding, plaintiff was the low bidder for many parts, but the city refused to accept its bids.

Plaintiff filed a bill in equity on February 5, 1944. He prayed that the mayor and other city officers be enjoined from executing contracts based on the recent acceptances of the higher bids, and that the court order the city to enter into contracts with the lowest responsible bidders.

On May 22, 1944, Judge Flood entered an order restraining defendants (1) from executing the contracts in question; (2) from incorporating the debated condition in future invitations for bids, and (3) from awarding contracts for replacement parts to any except the lowest responsible bidders. Defendants filed exceptions which were overruled by Judge Flood's opinion filed January 13, 1945.

On March 14, 1947, the director of supplies and purchases petitioned for a clarification of the decree. He had been advised by the city solicitor that he could, despite the decree, restrict bids to parts manufactured by the makers of the meters being repaired, so long as

he did not restrict the persons who should supply the parts to the city. The city controller disagreed with this interpretation and refused to approve any contract based upon such bids. In his petition the director of supplies claimed that as a result of this difference of opinion between the two departments, manufacturers and suppliers of parts had refused to bid and many thousands of meters requiring repairs could not be fixed.

Judge Flood, in his opinion concerning clarification of the decree, stated that the controller was fully justified in refusing to approve contracts based upon bids restricted in a way which the court had said was illegal, and that in view of the language of the opinion and decree, the controller would have risked contempt proceedings if he had disobeyed the decree. Nevertheless, on May 10, 1947, he filed a final decree striking the paragraph of the original decree which prohibited the city from awarding contracts except to the lowest responsible bidder on the ground it had been unnecessary to decide this broad issue in the case before him.

The McHugh case is important because it casts considerable doubt on the testimony that the city could not get parts during the war, and because it indicates that the city's difficulties in obtaining parts were in a large measure caused by the city's mismanagement of the parts bidding invitations. From the facts as stated above it is clear that at least as late as December 1943 parts manufacturers were bidding for the opportunity to furnish meter parts to the city. The fact that they were putting pressure on the city to buy their parts certainly indicates that they had parts to sell. Furthermore, Judge Flood found as a fact that the Phoenix Meter Corporation had been furnishing thousands of dollars worth of meter parts to the city since 1935. Phoenix had sold the following amounts since the start of the war:

"...

"May 4, 1942 . . . . . . . . . . . . . . . . . . . . . . . $8910.00
"February 9, 1942 . . . . . . . . . . . . . . . . . $23250.73
"February 2, 1943 . . . . . . . . . . . . . . . . . $23600.00
"August 20, 1943 . . . . . . . . . . . . . . . . . . $2080.30"

Inter alia finding of fact no. 16, adjudication of May 22, 1944. (It is instructive to note that the city's purchases from Phoenix in 1942 and 1943 were larger than those of any previous year listed.) Thus the city was buying parts during the war years up to and including 1943, and during 1944 suppliers were fighting for the privilege of selling it parts.

On March 14, 1947, the director of supplies, in his petition for clarification of the decree, claimed that, as a result of a difference of opinion over the interpretation of the decree, manufacturers and suppliers of parts had refused to bid. This would indicate, by inference, that in 1947 manufacturers were ready to supply parts but did not bid because of the dispute over the meaning of Judge Flood's decree. Since the war had ended in 1945 it is logical to believe that the manufacturers were back in civilian production by 1947, if indeed they had ever been out of it.

On the basis of the above analysis of the evidence, we conclude that the city has not proven its contentions and that an unreasonable and inexcusable length of time passed while the meter was out of order until the date when it was at last repaired.

The city also contends that the following statute places the burden of proof on defendant:

"Tax claims and municipal claims shall be prima facie evidence of the facts averred therein in all cases; and the averments in both tax and municipal claims shall be conclusive evidence of the facts averred therein, except in the particulars in which those averments shall be specifically denied by the affidavit of

defense, or amendment thereof duly allowed": Municipal Lien Act of May 16, 1923, P. L. 207, sec. 20, 53 PS §2040; Philadelphia v. T. B. Rice & Sons Co., 274 Pa. 256 (1922) ; Borough of Huntingdon v. Dorris, 78 Pa. Superior Ct. 469 (1922).

In our opinion, defendant has met his burden of proving that the city's claim is barred by the statute of limitations, for the evidence shows that a considerable part of the claim as amended is barred on its face and that the city has spent more than a reasonable time before sending defendant a bill. The general rule is that when a defendant shows that a claim is barred by the statute of limitations, the burden of proving facts sufficient to remove the bar of the statute is cast on plaintiff: McPhilomy v. Lister, 341 Pa. 250 (1941) ; 34 Am. Jur. 353, 354. The city has not met the burden of proving its contention that wartime shortages and unavoidable litigation existed. Even if the burden of disproving the existence of such forces were on defendant, we think defendant has met this burden. We, therefore, make the following findings of fact and conclusions of law:

### Findings of Fact

1. From January 1, 1943, until September 17, 1950, the water meter in the premises owned by Joseph Charleston and located at 2019-21 North 22nd Street, in the City of Philadelphia, was out of order and did not register.

2. On September 17, 1950, the City of Philadelphia repaired the meter and set the dials back to zero.

3. The meter was read on January 22, 1951, and an average daily consumption based on the water consumed since September 17, 1950, was computed.

4. On February 1, 1951, the city sent a bill addressed to Joseph Charleston based on this daily average. The bill set forth the amount of water which the

city estimated was consumed during each year, together with a separate sum charged for each year.

5. On May 21, 1954, the city filed in Court of Common Pleas No. 6 a claim for "Water Rent for the year 1951" and "Sewer Rent for the year 1951", together with interest and a penalty.

6. This claim has never been paid, in whole or in part.

7. This case was assigned to Court of Common Pleas No. 4 for trial and was heard without a jury on December 13, 1955. A further hearing was held on January 24, 1956.

8. On March 14, 1956, we allowed the city, over defendant's objections, to amend its claim to read:

"Excess water rent for the period January 1, 1943 to January 22, 1951.

"Excess sewer rent for the period January 1, 1943 to January 22, 1951."

9. The City of Philadelphia was able to purchase parts with which to repair water meters up to December 27, 1943, and had purchased such parts.

10. On that date, the city issued invitations to bid for furnishing meter parts and attached to these invitations a condition which was subsequently held to be illegal by Judge Flood in the case of McHugh v. Samuel, C. P. 6, December term, 1943, no. 2739.

11. Because of confusion engendered by the manner in which bids were invited and a difference of opinion between city officials as to the effect of Judge Flood's decree, manufacturers and suppliers of meter parts refused to bid until another opinion and decree were issued on May 27, 1947.

12. The Second World War ended with victory over Japan on August 14, 1945.

13. Parts with which to repair meters were available in 1947.

## Conclusions of Law

1. A municipal claim for water and sewer rents imposed on any property becomes a lien against such property when duly filed in the court of common pleas of the county in which the property is situated.

2. A municipal lien for unpaid excess water rent is lost unless the claim is filed in the courts of common pleas on or before the last day of the third calendar year after that in which the rents are first payable.

3. Bills for water rents become "first payable" when the municipality renders a bill for such rents, provided such bills are rendered within a reasonable time after the end of each rent year.

4. A municipality may not delay rendering a bill for excess water rent for an unreasonable period of time. If it does so delay, the three-year statute of limitations set forth by the Municipal Lien Act of May 16, 1923, P. L. 207, sec. 9, 53 PS §2029, will start running against it after it has had a reasonable time in which to read the meters and render a bill.

5. In the instant case more than a reasonable time in which to render a bill for excess water consumed during the period from January 1, 1943, to December 31, 1949, had elapsed when the bill was rendered on February 1, 1951.

6. The bill for excess water consumed during the year 1950 and the first 22 days of 1951 was rendered within a reasonable time after the year 1950 had ended.

7. The three-year statute of limitations for the year 1949 and prior years began to run in 1950.

8. The city's claim for the years 1943 to 1949, inclusive, is barred by the three-year statute of limitations because the claim was filed in court on May 21, 1954, after the statute had run.

9. The city's claim for the year 1950 and the first 22 days of 1951 is valid and subsisting.

10. The burden of proving any defense to a municipal claim is on defendant.

11. Defendant has met this burden of proof with respect to the claim for the years 1943 to 1949, inclusive, because the evidence shows that the claim was barred by the statute of limitations.

12. The statute of limitations was not tolled by any alleged shortage of materials due to the war or inability on the part of the city to obtain parts with which to repair inoperative meters, because the city was able to obtain parts until late in 1943 and would have been able to obtain parts in 1947 if it had not involved itself in litigation by its own fault.

Wherefore, we enter the following

*Decree*

And now, April 3, 1956, upon consideration of the foregoing case, it is ordered, adjudged and decreed that

1. The claim of the City of Philadelphia against Joseph Charleston for excess water and sewer rents for the years 1943 to 1949, inclusive, hereby is denied.

2. The lien of the City of Philadelphia against premises 2019-21 North 22nd Street, Philadelphia, for excess water and sewer rents for the years 1943 to 1949, inclusive, be and it hereby is removed.

3. The lien against said premises for excess water and sewer rents for the year 1950 and the first 22 days of 1951 is valid and subsisting.

4. Judgment is entered in favor of the City of Philadelphia in the amount of $164.06 for excess water rent for the period January 1, 1950, to January 22, 1951, inclusive, and in the amount of $98.01 for excess sewer rent for the same period, with the appropriate interest and penalties.